No. 22-35305

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

KIM CARTER MARTINEZ,
on behalf of herself and all other similarly situated,

*Plaintiff-Appellee,*

v.

ZOOMINFO TECHNOLOGIES INC., a Delaware corporation,

*Defendant-Appellant.*

On Appeal from the U.S. District Court for the
Western District of Washington
No. 3:21-cv-05725 (Hon. Marsha J. Pechman)

**BRIEF OF SPOKEO, INC., PEOPLEFINDERS LLC,
AND BEENVERIFIED, LLC AS *AMICI CURIAE*
SUPPORTING DEFENDANT-APPELLANT**

John Nadolenco
Jennifer M. Chang
Daniel D. Queen
MAYER BROWN LLP
350 S. Grand Avenue,
    25th Floor
Los Angeles, CA 90071
(213) 229-9500

Nicole A. Saharsky
MAYER BROWN LLP
1999 K Street, Northwest
Washington, DC 20006
(202) 263-3000
nsaharsky@mayerbrown.com

Benjamin D. Bright
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500

*Counsel for* Amici Curiae

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Spokeo, Inc. is a Delaware corporation, with no parent or subsidiary, and no publicly held company owns 10% or more of its stock.

PeopleFinders LLC is a Delaware corporation. PeopleFinders LLC is a wholly owned subsidiary of B2C Midco, LLC. B2C Midco, LLC is a wholly owned subsidiary of B2C Newco, LLC. B2C Newco, LLC is a wholly owned subsidiary of RSM Holdco, Inc. RSM Holdco, Inc. is a closely held corporation, and no corporation or publicly held company owns more than 10% of its stock.

BeenVerified, LLC is a Delaware limited liability company, whose parent is The Lifetime Value Co. LLC, and no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

INTEREST OF THE *AMICI CURIAE* ........................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 3

ARGUMENT ........................................................................................ 5

I.  PLAINTIFF LACKS ARTICLE III STANDING ........................... 5

    A.  Plaintiff Has Not Suffered The Concrete Harm
        Necessary To Invoke Federal Court Jurisdiction ................. 5

    B.  Plaintiff Has Not Shown That Her Claimed Injuries
        Were Cognizable At Common Law ..................................... 11

II. PLAINTIFF'S CLAIMS SHOULD BE DISMISSED UNDER
    THE ANTI-SLAPP STATUTE .................................................... 22

    A.  ZoomInfo's Directory Information Concerns Matters In
        The Public Interest And Is Protected Speech ..................... 24

    B.  Plaintiff Has Not Shown A Reasonable Probability Of
        Success On Her Claims ....................................................... 31

CONCLUSION ................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal,*
556 U.S. 662 (2019) .......................................................... 3, 9

*Barrett v. Rosenthal,*
40 Cal. 4th 33 (2006) ........................................................ 28

*Bolger v. Youngs Drug Prods. Corp.,*
463 U.S. 60 (1983) ............................................................ 29

*Brewer v. Hustler Mag., Inc.,*
749 F.2d 527 (9th Cir. 1984) ........................................... 17

*Burrow-Giles Lithographic Co. v. Sarony,*
111 U.S. 53 (1884) ............................................................ 20

*Chicago Record-Herald Co. v. Tribune Ass'n,*
275 F. 797 (7th Cir. 1921) ............................................... 20

*Davis v. Avvo, Inc.,*
No. C11-1571RSM, 2012 WL 1067640 (W.D. Wash. Mar.
28, 2012) .......................................................................... 26

*Dex Media W., Inc. v. City of Seattle,*
696 F.3d 952 (9th Cir. 2012) ............................... 25, 28, 30

*Dora v. Frontline Video, Inc.,*
15 Cal. App. 4th 536 (1993) ............................................ 24

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,*
499 U.S. 340 (1991) .......................................................... 20

*Fendler v. Morosco,*
253 N.Y. 281 (1930) ......................................................... 20

*Flatley v. Mauro,*
39 Cal. 4th 299 (2006) ..................................................... 23

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                               **Page(s)**

*Folsom v. Marsh,*
9 F. Cas. 342 (Mass. Dist. Ct. 1841) ................................... 21

*Gill v. Hearst Publ'g Co.,*
40 Cal. 2d 224 (1953) ....................................................... 17

*Gionfriddo v. Major League Baseball,*
94 Cal. App. 4th 400 (2001) ............................................... 32

*Hilton v. Hallmark Cards,*
599 F.3d 894 (9th Cir. 2010) .............................................. 24

*Hunter v. CBS Broad. Inc.,*
221 Cal. App. 4th 1510 (2013) ............................................ 24

*Kronemyer v. Internet Movie Database Inc.,*
150 Cal. App. 4th 941 (2007) ............................................. 28

*Melvin v. Reid,*
112 Cal. App. 285 (Cal. Dist. Ct. App. 1931) ...................... 17

*Montana v. San Jose Mercury News, Inc.,*
34 Cal. App. 4th 790 (1995) ............................................... 32

*Moser v. Press Publ'g Co.,*
109 N.Y.S. 963 (Sup. Ct. Sullivan Cty. 1908) .................... 15

*Munden v. Harris,*
134 S.W. 1076 (Mo. Ct. App. 1911) ................................... 19

*In re NCAA Student-Athlete,*
724 F.3d 1268 (9th Cir. 2013) ...................................... 23, 31

*New Kids on The Block v. News Am. Publ'g, Inc.,*
971 F.2d 302 (1992) ......................................................... 32

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                    **Page(s)**

*Park v. Bd. of Trs. of Cal.*,
  2 Cal. 5th 1057 (2007) ................................................ 31

*Pavesich v. New England Life Ins. Co.*,
  50 S.E. 68 (Ga. 1905) ............................................ 16, 17

*Roberson v. Rochester Folding Box Co.*,
  171 N.Y. 538 (1902) .................................................. 15

*Sarver v. Chartier*,
  813 F.3d 891 (9th Cir. 2016) ................................... 23, 24

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ............................................. *passim*

*The Trade-Mark Cases*,
  100 U.S. 82 (1879) ................................................... 20

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) .......................................... *passim*

*Vrdolyak v. Avvo, Inc.*,
  206 F. Supp. 3d 1384 (N.D. Ill. 2016) ......................... 26

*Weinberg v. Feisel*,
  110 Cal. App. 4th 1122 (2003) .................................. 27

*Zacchini v. Scripps-Howard Broad. Co.*,
  433 U.S. 562 (1977) .................................................. 20

**Statutes and Rule**

Cal. Civ. Code § 3344 ........................................ 7, 11, 32

Cal. Civ. Proc. § 425.16 ......................................... 23, 27

Fed. R. App. P. 29 ........................................................ 1

**Other Authorities**

Samantha Barbas, *From Privacy to Publicity:  The Tort of Appropriation in the Age of Mass Consumption*, 61 Buff. L. Rev. 1119 (2013) ........................................................... 14, 15, 16, 19

Christina Bohannan, *Copyright Harm, Foreseeability, and Fair Use*, 85 Wash. Univ. L. Rev. 969 (2007) ..................................... 21

5 *McCarthy on Trademarks and Unfair Competition* (5th ed. 2022) ......................................................................................... 19, 20

William L. Prosser, *Privacy*, 48 Cal. L. Rev. 383 (1960) ............ 13, 15, 19

Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890) ............................. 12, 13, 14, 15, 16

## INTEREST OF THE *AMICI CURIAE*

*Amici* are three businesses that operate people-search websites. They compile information about individuals from public sources, then provide websites that allow users to search for and purchase profile reports created from that public information. Some of *amici*'s websites allow users to view "teaser" profiles that identify individuals by name, age, and other partially redacted information (such as addresses, phone numbers, and email addresses), and then obtain a free or paid subscription to view other public information from their databases.[1]

*Amici*'s services are used and valued by an array of public and private entities and individuals. Law enforcement agencies use these services to identify and locate suspects and witnesses and to serve subpoenas. Welfare agencies use the services to find parents evading child support awards. The Veterans Administration uses the services to locate the next-of-kin of fallen soldiers. Businesses use the services to detect order fraud and to update customer and prospect databases.

---

[1] No counsel for a party authored this brief in whole or in part, and no person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(c)(5). All parties have consented to the filing of this brief.

Individuals use the services to find lost relatives and friends, plan family reunions, research service providers, and root out scams.

This case presents two important issues. The first is whether providing accurate, publicly available information, such as an individual's name, phone number, job title, and workplace address, in a "teaser" profile on a people-search website causes the individual concrete harm sufficient to confer standing under Article III of the Constitution. The second is whether the public information conveyed by people-search websites involves a matter of "public interest" under California's anti-SLAPP statute and is protected speech under the First Amendment. In *amici*'s view, simply providing that limited, publicly available information does not cause a concrete harm for Article III standing purposes, and the information provided by the websites concerns matters in the public interest and is fully protected by the First Amendment.

*Amici* file this brief to provide the Court with their unique perspective on these issues. Many lawsuits have been filed against companies that operate people-search websites in recent years, presenting the same issues as in this case. Those lawsuits threaten to chill companies from providing valuable services that are in the public

interest. *Amici* therefore have a strong interest in ensuring that the Court enforces the constitutional limits on standing and on lawsuits that threaten to chill valuable, constitutionally protected speech.

## INTRODUCTION AND SUMMARY OF ARGUMENT

ZoomInfo Technologies Inc. (ZoomInfo) operates a website that provides a small amount of accurate, publicly available information about a person when the person's name is searched. The website also offers to provide additional publicly available information, either through a free trial or through a paid subscription service. Plaintiff claims that by making available a "teaser" profile and then offering to provide additional information, ZoomInfo violated her statutory and common-law rights of publicity and caused her emotional and financial harm.

As a threshold matter, Plaintiff has failed to establish that she suffered concrete harm sufficient to confer Article III standing. Although she asserts that she experienced emotional and financial harm, she has not pleaded facts to substantiate those assertions, thus running afoul of *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2019).

More fundamentally, Plaintiff does not plead a cognizable injury. In *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), the Supreme Court explained that, to determine whether a plaintiff alleges a concrete injury for Article III standing purposes, courts should assess whether the alleged harm bears a "close relationship" to a historical or common-law analogue. That inquiry—which the district court simply ignored here— reveals that Plaintiff could not recover at common law. The most analogous claim here is a claim for misappropriation of name and likeness. Plaintiff could not recover emotional-distress damages for such a claim at common law because the information at issue already is public. Plaintiff likewise could not recover money damages for her claims at common law, both because the information already is public, and because she has not pleaded that she suffered any financial loss from ZoomInfo's use of her public information.

Plaintiff's claims also should be dismissed under California's anti-SLAPP statute in order to protect ZoomInfo's exercise of its First Amendment rights. ZoomInfo's directory essentially is a modern-day yellow pages. It provides basic identifying information about a person— information that already is publicly available from other sources—that

could be used to contact the person. As this Court has recognized, directories that provide that type of contact information concern matters in the public interest and are fully entitled to First Amendment protection. Making that information available is in the public interest because members of the public use the directories to obtain useful and needed information. The district court focused narrowly on the value of Plaintiff's particular information, rather than considering the value of ZoomInfo's directory as a whole. When viewed as a whole, the public interest and First Amendment value in people-search directories is obvious, as many courts have recognized.

The Court should reverse the district court's denial of ZoomInfo's anti-SLAPP motion and remand with instructions to dismiss the case for lack of standing and for failure to state a claim.

## ARGUMENT

## I. PLAINTIFF LACKS ARTICLE III STANDING

### A. Plaintiff Has Not Suffered The Concrete Harm Necessary To Invoke Federal Court Jurisdiction

1. To demonstrate Article III standing, a plaintiff must show that she has "suffered an injury in fact" that is "fairly traceable to" the defendant's conduct and that likely would be "redressed by a favorable

judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To satisfy the injury requirement, the plaintiff must show that she has "suffered an invasion of a legally protected interest that is concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks omitted).

In *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), the Supreme Court explained when a harm is sufficiently "concrete" to establish Article III standing. The Court observed that "history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider," and, more specifically, it directed lower courts to "assess whether the alleged injury to the plaintiff has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 2204 (internal quotation marks omitted). That "inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* Although "an exact duplicate in American history and tradition" is not required, an alleged injury that "does not bear a sufficiently close relationship" to a "historical or common-law analog" does not "qualify for Article III standing." *Id.* at 2204, 2209-10 & n.6 (internal quotation

marks omitted).  The ultimate reference point for common-law analogues is the harms actionable at the Founding, but—as *TransUnion* demonstrates—injuries with a lengthy common-law pedigree also may qualify.  *See id.* at 2204.

2.     Here, Plaintiff invokes two causes of action, one for violation of California's right-of-publicity law, California Civil Code § 3344, and one for common-law misappropriation of a likeness.  ER-166–68 (Compl. ¶¶ 54-64).  Her core allegation is that she has suffered harm because if someone searched her name on ZoomInfo, ZoomInfo would provide publicly available information about her (such as her name and employer) in a "teaser" profile and would offer to provide additional information, either through a free trial or for a fee.  ER-151 (Compl. ¶¶ 4-5).

Plaintiff does not claim an injury simply based on the fact that ZoomInfo *displays* her public information.  *See* ER-60 (stating that the lawsuit "is not about the distribution of [her] . . . information").  Rather, her claim is that ZoomInfo has injured her by providing the teaser profile in order to offer the user a free or paid subscription to access additional public information.  ER-157–58, 160–62 (Compl. ¶¶ 28-29, 33-37).

7

Plaintiff contends that she has suffered two injuries: a mental injury because ZoomInfo's conduct made her feel "deeply uncomfortable," "worried," and "uncertain," ER-163–64 (Compl. ¶ 44), and a proprietary injury because ZoomInfo misappropriated the "economic value of [her] name[], likeness[], and persona[]," ER-167 (Compl. ¶ 59).

The district court determined that Plaintiff adequately alleged that she suffered concrete mental harm because she alleged that she is "deeply uncomfortable in the knowledge that ZoomInfo is using her name and persona in advertisements for a product with which she has no relationship and which she has no desire to promote." ER-12 (quoting Compl. ¶ 44). The court concluded that Plaintiff alleged adequate facts to demonstrate a financial injury because she alleged that ZoomInfo deprived her of the "commercial value of her persona." ER-10.

3.     At the outset, Plaintiff never contends that anyone actually searched for her name or viewed her teaser profile, other than herself and her lawyers. ER-150 (Compl. ¶ 2). And she does not allege any facts supporting a plausible inference that it was "imminent" that someone else would view her profile. She therefore cannot claim an "actual or imminent" injury, which is required for Article III standing.

*TransUnion*, 141 S. Ct. at 2210-11. The district court did not address this significant problem at all.

Even assuming that someone searched for her on ZoomInfo and saw her teaser profile, Plaintiff has not demonstrated an injury sufficient to confer Article III standing. Plaintiff has the burden to establish the prerequisites for Article III standing. *TransUnion*, 141 S. Ct at 2207-08. At the pleading stage, that means she "must clearly allege facts demonstrating each element" to establish standing. *Spokeo*, 578 U.S. at 338 (internal quotation marks and alteration omitted). Here, Plaintiff rests entirely on conclusory assertions, without alleging the necessary supporting facts. She does not, for example, plead any facts substantiating the value of the information in ZoomInfo's teaser profile, how ZoomInfo made money from that information, or how she was deprived of any commercial opportunity to exploit that information.

The same is true for her claim of emotional distress. Plaintiff simply asserts, without any "factual enhancement," *Iqbal*, 556 U.S. at 678, that she was "seriously distressed to discover that ZoomInfo is using her name and personal information," ER-150 (Compl. ¶ 2). Without

more, Plaintiff has not satisfied the minimum pleading requirements to proceed with her claim.

4. Allowing plaintiff to proceed to discovery based on bare allegations of a statutory violation, without proof of an actual injury, would have detrimental consequences for a wide variety of businesses that collect and publish publicly available information about individuals, including people-search companies, newspapers, yellow-page directories, credit reporting agencies, and other data aggregators. It also would harm the many customers that depend on the services that data aggregators offer. For example, banks depend on the information to comply with disclosure obligations, to underwrite loans, and to offer financial services to consumers; insurers use the information to underwrite insurance and prevent claims fraud; marketing companies use the information to identify potential customers and target advertising; and government agencies use the information for investigations and in providing benefits.

Here, Plaintiff seeks to represent millions of people—namely, all California residents who are not subscribers of ZoomInfo and whose public information is available through ZoomInfo teaser profiles, ER-154–55, 164 (Compl. ¶¶ 20, 45)—and to obtain statutory damages of

at least $750 for each of them, *see* California Civil Code § 3344. If Plaintiff were permitted to proceed with her claims even though she never alleged any type of imminent or concrete harm, and a class were certified, the potential liability would be enormous. That enormous potential liability could chill the speech of entire industries that publish publicly available information and that serve the public interest. Article III's concrete harm requirement prevents that nonsensical result.

## B. Plaintiff Has Not Shown That Her Claimed Injuries Were Cognizable At Common Law

A fundamental problem with the district court's standing decision is that the court did not engage in the analysis required by *TransUnion*. Although the court issued its decision after *TransUnion*, and the parties provided briefing addressing it, ER-37, 62–63, the district court did not consider whether a historical analogue for Plaintiff's asserted injuries exists. Instead, the court reviewed decisions from the California courts that specified the elements of Plaintiff's two causes of action. But as the Supreme Court has held, Article III standing is a separate inquiry from the merits; it "requires a concrete injury even in the context of a statutory violation." *Spokeo*, 578 U.S. at 341. "[U]nder Article III, an injury in law is not an injury in fact. Only those plaintiffs who have been *concretely*

*harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion*, 141 S. Ct. at 2205.

If the district court had performed the historical analysis, it would have recognized that Plaintiff could not recover at common law based on the facts she has pleaded. The closest common-law analogue for Plaintiff's claims is misappropriation of name and likeness, which permitted recovery of emotional distress damages for invasion of privacy and recovery of pecuniary-loss damages for infringement of the Plaintiff's intellectual property. The problem is that Plaintiff would not be able to recover either type of damages at common law. Courts did not allow emotional-distress damages if the allegedly misappropriated information already was public, and they did not allow pecuniary-loss damages based on public facts or when the Plaintiff failed to show actual economic harm.

1. The common-law right of publicity originally emerged out of the claim for misappropriation of name and likeness, which was grounded in the right to privacy. In 1890, in their landmark law review article, Samuel Warren and Louis Brandeis explained that common-law rights included a right to privacy, which they described as a "the right to

be let alone." Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 193 (1890) (Warren & Brandeis). One aspect of this right was the right to ensure that private information would not be made public: "Instantaneous photographs and newspaper enterprise have invaded the sacred precincts of private and domestic life; and numerous mechanical devices threaten to make good the prediction that what is whispered in the closet shall be proclaimed from the house-tops." *Id.* at 195 (internal quotation marks omitted).

In the following decades, commentators explained that the common-law right to privacy encompassed four separate causes of action: intrusion upon seclusion, public disclosure, false light, and misappropriation of a plaintiff's name and likeness. William L. Prosser, *Privacy*, 48 Cal. L. Rev. 383, 389 (1960) (Prosser). Misappropriation of a person's name and likeness became known as violation of the person's "right of publicity," *id.* at 406-07 (citing *Haelan Labs. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir. 1953)), and "it consist[ed] of the appropriation, for the defendant's benefit or advantage, of the plaintiff's name or likeness," *id.* at 401.

2. In assessing common-law claims for misappropriation of name and likeness, courts considered two different kinds of potential injuries: emotional and dignitary harms, and financial harms to proprietary interests.

In early cases concerning the misappropriation of name and likeness, plaintiffs primarily sought to remedy emotional, reputational, or dignitary injuries resulting from unwanted publicity. These cases emerged in the late nineteenth century during a time of social upheaval, new technologies, and the advent of mass-market advertising. *See* Samantha Barbas, *From Privacy to Publicity: The Tort of Appropriation in the Age of Mass Consumption*, 61 Buff. L. Rev. 1119, 1128 (2013) (Barbas). In particular, around this time, advertisers increasingly began using photographs to market their products. *Id.* at 1141-44. But the era's Victorian sensibilities led to a shortage of individuals willing to serve as models for new consumer products that came to market. *See id.*

As a result, advertisers began acquiring portraits from studio photographers—without providing notice to any of the subjects—and publishing them as advertisements for their products. Barbas 1141-44. "For years there [was] a feeling that the law must afford some remedy for

the unauthorized circulation of portraits of private persons," Warren & Brandeis 195, and so plaintiffs increasingly filed suit for emotional damages based on misappropriations of their identity.

The courts gradually became willing to permit recovery for those claims. In 1890, a performer whose photograph was surreptitiously taken without her consent was granted a preliminary injunction to enjoin the photographer's use of it. Warren & Brandeis 195-96 & n.7 (citing *Manola v. Stevens & Myers* (N.Y. Sup. Ct. 1890) (unpublished)). But then in *Roberson v. Rochester Folding Box Co.*, 171 N.Y. 538 (1902), the New York Court of Appeals refused to recognize a claim for misappropriation of name and likeness. In response, there was a public outcry, and the New York legislature made it both a crime and a tort "to publish, without consent, a person's 'name, portrait or picture' for the purposes of 'trade.'" Barbas 1163 (quoting N.Y. Civ. Rights Law § 50); *see* Prosser 385-86. The statute "g[ave] a cause of action to a person whose portrait was unauthorizedly published or used . . . in connection with the advertisement of some patent medicine or some other commodity which the advertiser was interested in selling," *Moser v. Press Publ'g Co.*, 109 N.Y.S. 963, 965 (Sup. Ct. Sullivan Cty. 1908), but plaintiffs could recover

only for emotional harms, and not lost profits, Barbas 1163.  Around the same time, the Georgia Supreme Court permitted a plaintiff to recover for dignitary harms related to misappropriation of his name and likeness, explaining that "the law recognizes, within proper limits, as a legal right, the right of privacy, and that the publication of one's picture without his consent by another as an advertisement, for the mere purpose of increasing the profits and gains of the advertiser, is an invasion of this right." *Pavesich v. New England Life Ins.*, 50 S.E. 68, 80-81 (Ga. 1905).

Significantly, these courts did not permit a person to recover for invasion of the right to privacy, including on a theory of misappropriation of name and likeness, based on public information.  As Warren and Brandeis explained, "[t]he right to privacy ceases upon the publication of facts by the individual, or with his consent. . . .  The right is lost only when the author himself communicates his production to the public[]— in other words, publishes it."  Warren & Brandeis 200, 218 (citing *Duke of Queensberry v. Shebbeare*, 2 Eden 329 (1758), and *Bartlett v. Crittenden*, 5 McLean 32, 41 (1849)).

For example, in *Pavesich*, the Georgia Supreme Court explained that a prerequisite for recovery was that the advertiser had "invade[d]"

the "purely private" domain; an individual could not recover damages if he "waived" his right to privacy by making private matters public. 50 S.E.2d at 69-70, 72. As the misappropriation of name and likeness tort became more well-recognized, courts continued to impose the same limitation on recovery.[2] Thus, at common law, a plaintiff could not recover for misappropriation of name and likeness when the information already was public.

Here, the complaint asserts that, because Plaintiff's public information is available on ZoomInfo, she feels "deeply uncomfortable," "worried," and "uncertain." ER-163–64 (Compl. ¶ 44). But Plaintiff's claims are nothing like the common-law cases where the plaintiffs suddenly found their likenesses on advertisements without their consent;

---

[2] *See, e.g.*, *Gill v. Hearst Publ'g Co.*, 40 Cal. 2d 224, 230 (1953) (no privacy interest where plaintiffs voluntarily exposed themselves to the public gaze in their ice cream shop, which was open to the public); *Melvin v. Reid*, 112 Cal. App. 285, 290 (Cal. Dist. Ct. App. 1931) (The right to privacy "does not exist where the person has published the matter complained of, or consented thereto. . . . There can be no privacy in that which is already public."); *Brewer v. Hustler Mag., Inc.*, 749 F.2d 527, 529-30 (9th Cir. 1984) (no cause of action for violation of the right to privacy when the plaintiff previously published a photograph of himself by distributing it to approximately 200 people in the advertising industry).

rather, ZoomInfo has merely compiled a limited amount of publicly available information—like the yellow pages or directory assistance—and offered to provide a (hypothetical) user with additional information.

Plaintiff could not recover for emotional distress at common law because all of the information at issue already is public. ZoomInfo's "teaser" profile consists of basic contact information: name, employer, title, job description, a redacted work email address, and the address and phone number for her employer's headquarters. ER-157 (Compl. ¶ 28); *see* ER-115–17. Plaintiff herself published the same professional contact information on her LinkedIn profile and the AFSCME employee page. ZoomInfo Br. 32 n.9. It is undisputed that ZoomInfo provided only accurate, public information about Plaintiff. Those facts would doom any request for emotional-distress damages as part of a misappropriation claim at common law. The whole point of the tort was to enable an individual to keep facts about herself private—but when the individual publishes those facts herself, that justification vanishes.

3. Although the right of publicity first emerged from the right to privacy, in the early years of the twentieth century it evolved into a distinct cause of action that vindicated different interests. As the late

nineteenth century's Victorian sensibilities gave way to a modern American consumer culture, plaintiffs increasingly brought misappropriation claims not to vindicate their emotional and dignitary interests, but to seek compensation for the commercial use of their likenesses. *See* Barbas 1172-87. "The interest protected" by the right of publicity became "not so much a mental as a proprietary one, in the exclusive use of the plaintiff's name and likeness as an aspect of his identity." Prosser 406. Put another way, what the individual wanted "was not protection against unreasonable intrusion into privacy, but a right to control the commercial value of identity." 5 *McCarthy on Trademarks and Unfair Competition* § 28:4 (5th ed. 2022) (McCarthy).

This new proprietary right was rooted in intellectual-property law. *See, e.g., Munden v. Harris*, 134 S.W. 1076, 1077 (Mo. Ct. App. 1911) (holding that the plaintiff had a right to privacy because his image could be a source of profit as a form of property). As the Supreme Court has explained, "the State's interest in permitting a 'right of publicity' is in protecting the proprietary interest of the individual in his [performance] in part to encourage such entertainment" and is "analogous to the goals of patent and copyright law, focusing on the right of the individual to reap

the reward of his endeavors and having little to do with protecting feelings or reputation." *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 573 (1977); *see* 5 McCarthy § 28:6.

Significantly, intellectual-property law did not provide protection for information that already was in the public domain. After all, the whole point of intellectual-property protection is to provide a person with exclusive rights because he or she created an original work of authorship or invented something new—rather than publishing or creating something already in the public domain. For example, two nineteenth-century Supreme Court cases—*The Trade-Mark Cases*, 100 U.S. 82 (1879), and *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884)—established "originality" as a constitutional requirement for copyright protection. Applying those precedents, courts uniformly held that copyright protection cannot extend to facts in the public domain because they "do not owe their origin to an act of authorship." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 347 (1991); *see Chicago Record-Herald Co. v. Tribune Ass'n*, 275 F. 797, 798-99 (7th Cir. 1921); *Fendler v. Morosco*, 253 N.Y. 281, 291 (1930).

Further, to recover for financial harms based on an intellectual-property theory at common law, a plaintiff had to demonstrate that the appropriated information had financial value and that she suffered a financial injury as a result. Under the Statute of Anne of 1710—on which the United States based its first copyright law—plaintiffs could bring a copyright infringement claim only by means of an "action for trespass on the case," which required a showing of physical injury or economic loss. *See* Christina Bohannan, *Copyright Harm, Foreseeability, and Fair Use*, 85 Wash. Univ. L. Rev. 969, 974-75 (2007). Likewise, in early American copyright law, "only uses that caused or were likely to cause the copyright owner to lose sales of her copyrighted work were deemed infringing." *Id.* at 975. For example, in the seminal fair-use case *Folsom v. Marsh*, 9 F. Cas. 342 (Mass. Dist. Ct. 1841), Justice Story emphasized that actual damages were necessary to show copyright infringement, holding that liability depends on "the degree in which the use may prejudice the sale, or diminish the profits, or supersede the objects, of the original work." *Id.* at 348.

Here, Plaintiff repeatedly asserts that ZoomInfo has misappropriated her intellectual-property interest in her name, contact

information, job title, and place of work, and she alleges that she suffered economic injury "through the unlawful taking of [her] valuable intellectual property; through the invasion of [her] privacy rights protected by statute and common law; [and] through ZoomInfo's unlawful profiting from its exploitation of [her] name[] and personal information." *See* ER-151, 153–54, 163 (Compl. ¶¶ 4, 17-19, 42-43).

Analogizing these alleged theories of harm to intellectual-property law shows why Plaintiff would not have recovered at common law: Her claims rest entirely on facts in the public domain, and she did not allege that she suffered any actual pecuniary loss, such as the diminishment of the economic value of her personal information. Recognizing Plaintiff's alleged injuries here would therefore override the limits on recovery that are intrinsic to intellectual-property law.

For all of these reasons, Plaintiff has not shown that she has suffered a concrete harm, and her claims should be dismissed for lack of standing.

## II. PLAINTIFF'S CLAIMS SHOULD BE DISMISSED UNDER THE ANTI-SLAPP STATUTE

California's anti-SLAPP statute "allows a court to strike any cause of action that arises from the defendant's exercise of his or her

constitutionally protected right of free speech or petition for redress of grievances." *Flatley v. Mauro*, 39 Cal. 4th 299, 311-12 (2006).  The statute protects various categories of activity, including "written or oral statement[s] or writing[s] made in a place open to the public or a public forum in connection with an issue of public interest" and "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  Cal. Civ. Proc. Code § 425.16(e)(3)-(4).

Under the anti-SLAPP statute, the defendant first must "make a prima facie showing that the plaintiff's suit arises from an act by the defendant made in connection with a public issue in furtherance of the defendant's right to free speech under the United States or California Constitution."  *In re NCAA Student-Athlete*, 724 F.3d 1268, 1272-73 (9th Cir. 2013).  If the defendant makes that showing, the burden shifts to the plaintiff to show a "reasonable probability" of success on her claim.  *Id.* at 1273; *see Sarver v. Chartier*, 813 F.3d 891, 901 (9th Cir. 2016).

Here, ZoomInfo's directory information concerns a "public issue" and is protected by the First Amendment, and Plaintiff has not shown a probability of success on her claims.

## A. ZoomInfo's Directory Information Concerns Matters In The Public Interest And Is Protected Speech

1. A threshold requirement for application of the anti-SLAPP statute is that the speech at issue involves a "public issue" or "an issue of public interest." *Hunter v. CBS Broad. Inc.*, 221 Cal. App. 4th 1510, 1526 (2013). The California courts have interpreted these terms "broadly in light of the statute's stated purpose to encourage participation in matters of public importance or consequence." *Hilton v. Hallmark Cards*, 599 F.3d 894, 906 (9th Cir. 2010). "The public is interested in and constitutionally entitled to know about things, people, and events that affect it." *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 545-46 (1993).

This Court has previously identified "three categories of public issues: (1) statements 'concern[ing] a person or entity in the public eye'; (2) 'conduct that could directly affect a large number of people beyond the direct participants'; (3) 'or a topic of widespread, public interest.'" *Sarver*, 813 F.3d at 901 (quoting *Rivero v. Am. Fed'n of State, Cty., & Mun. Emps.*, 105 Cal. App. 4th 913, 924 (2003)). Applying those standards, the information in ZoomInfo's business directory squarely concerns a matter of public interest.

ZoomInfo's preview profiles essentially operate as the digital equivalent of the yellow pages or directory assistance. The preview profiles provide truthful, work-related contact information about millions of business professionals, and then provide a way for the user to obtain additional information about any of those business professionals for a fee. ER-161 (Compl. ¶ 35). As this Court explained about the yellow pages, "[u]sers consult phone books for a number of reasons, including finding business, government, and personal telephone numbers and addresses, identifying businesses that provide a desired service or good, comparing goods and services available from multiple sellers, and learning about local telephone service and the community." *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 954 (9th Cir. 2012). ZoomInfo's digital directory serves precisely the same functions.

More generally, the information provided by ZoomInfo and other people-search websites can be used by a wide variety of people and organizations for important purposes. For example, law enforcement can use the information to identify suspects, witnesses, and other persons of interest; government agencies can use the information to identify potential beneficiaries of government services, as well as people who owe government debts; individuals can use the information to find long-lost

family members and friends or former colleagues; and businesses can use the information to identify potential customers or to uncover fraud.

Many courts have held that directories of names, addresses, phone numbers, court records, and other similar public information concern the public interest. For example, in *Davis v. Avvo, Inc.*, No. C11-1571RSM, 2012 WL 1067640 (W.D. Wash. Mar. 28, 2012), the defendant operated a website that compiled "profiles of many lawyers, doctors, and dentists in the U.S. . . . from publicly available material, including state bar associations, state courts, and lawyers' and firms' websites." *Id.* at *1. The court granted a motion to strike under Washington's anti-SLAPP statute, holding that the website's information addressed a "public concern" because it "provide[d] information to the general public which may be helpful to them in choosing a doctor, dentist, or lawyer." *Id.* at *3, *8.

Similarly, in *Vrdolyak v. Avvo, Inc.*, 206 F. Supp. 3d 1384 (N.D. Ill. 2016), the court granted a motion to dismiss the plaintiff's claim under the Illinois Right of Publicity Act on the ground that the online publication of attorneys' names, addresses, phone numbers, and court records was "akin to the yellow pages." *Id.* at 1388. The court reasoned that "to hold otherwise would lead to the unintended result that any

entity that publishes truthful newsworthy information about individuals such as teachers, directors and other professionals, such as a newspaper or yellow page directory, would risk civil liability simply because it generated revenue from advertisements placed by others in the same field." *Id.*

As in those cases, ZoomInfo's teaser profiles and full profiles include information (such as name, contact information, and job title) that allows users to identify businesses and individuals of interest. ER-151 (Compl. ¶ 4). That information is in the public interest because members of the public have an interest in accessing it in order to make contact with people and businesses, just as there is a public interest in enabling the public to look up a phone number in the phone book. The fact that ZoomInfo's directory is so large—including records for over one hundred million people—confirms that there is widespread public interest in that information. *See, e.g.*, *Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1132 (2003) ("[A] matter of public interest should be something of concern to a substantial number of people.").

2. The information ZoomInfo provides in the preview and full profiles also constitutes "written statements" made in a "public forum" under California Code of Civil Procedure § 425.16(e)(3). It is well

established that the contents of a website constitute written statements within the meaning of the anti-SLAPP statute. *See, e.g.*, *Kronemyer v. Internet Movie Database Inc.*, 150 Cal. App. 4th 941, 947 (2007). And "[w]eb sites accessible to the public . . . are 'public forums' for purposes of the anti-SLAPP statute." *Barrett v. Rosenthal*, 40 Cal. 4th 33, 41 n.4 (2006); *Kronemyer*, 150 Cal. App. 4th at 950 (statements "accessible to anyone who chooses to visit [a website]" can "hardly . . . be more public"). None of this is disputed: The complaint alleges that ZoomInfo "advertises subscriptions by *publicly* displaying teaser profiles of the Plaintiff and Class members" on the ZoomInfo website. ER-151 (Compl. ¶ 4) (emphasis added).

3. More generally, the information ZoomInfo collects and provides is fully protected by the First Amendment. In *Dex Media*, this Court held that "yellow pages directories qualify for full protection under the First Amendment." 696 F.3d at 954. The Court explained that "[a]lthough portions of the directories are obviously commercial in nature, the books contain more than that," and so the Court held that the yellow pages are fully protected speech under the First Amendment and evaluated the restrictions at issue "under strict scrutiny." *Id.*

That analysis applies here: ZoomInfo's directory provides business-related contact information that is indistinguishable from the yellow pages, and the fact that a user of the website can purchase access to additional information does not diminish the First Amendment protection afforded to the information in ZoomInfo's directory. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 n.14 (1983) (distinguishing speech that "advertises an activity" that is itself "protected by the First Amendment" from purely commercial speech).

4.     The district court erred in holding that ZoomInfo's directory does not qualify for protection under the anti-SLAPP statute. The court recognized that ZoomInfo's database of business professionals "might concern matters of general interest," but held that the website's "specific use of [the plaintiff's] persona" is not in the public interest and that "[t]here is no evidence to suggest that her persona is a matter of public interest or that ZoomInfo's use of it would generate wide public interest." ER-14, 17.

The district court erred by focusing narrowly on whether the particular information about Plaintiff satisfied the public-interest standard, rather than assessing the public interest in the information in ZoomInfo's database as a whole. This Court already has rejected that

approach: In *Dex Media*, the Court recognized that the ordinance at issue "regulate[d] a yellow pages phone book *as a whole*, not simply the individual advertisements contained therein." 696 F.3d at 957 (emphasis added). Accordingly, the Court evaluated "the nature of the speech *taken as a whole* to determine what level of First Amendment protection" it should receive. *Id.* at 957 (emphasis added).

That rule makes particular sense here because Plaintiff seeks to represent a proposed class of all California residents who are not ZoomInfo subscribers but whose personal information appears in preview profiles. ER-164 (Compl. ¶ 45). Indeed, her claims target ZoomInfo's entire business of providing publicly available information about individuals in return for a fee. Under the circumstances, it makes no sense for the district court to focus only on the public interest in Plaintiff's individual information. If the district court's analysis were correct, then no business providing a directory of individuals would qualify for protection under the anti-SLAPP statute—even though the public interest in such a directory in the aggregate is undoubtedly substantial.

## B. Plaintiff Has Not Shown A Reasonable Probability Of Success On Her Claims

Plaintiff's claims arise from ZoomInfo's display of "teaser profiles," which she asserts are used "to advertise paid subscriptions to zoominfo.com." ER-151 (Compl. ¶¶ 4, 6). In other words, the teaser profiles supply an "essential element" of Plaintiff's claims and form the gravamen of the lawsuit. *Park v. Bd. of Trs. of Cal.*, 2 Cal. 5th 1057, 1064 (2017). Thus, the activity that gave rise to Plaintiff's claims is protected activity under the anti-SLAPP statute, and the burden shifts to Plaintiff to establish "a reasonable probability that [she] will prevail on . . . her . . . claim." *In re NCAA*, 724 F.3d at 1273.

Plaintiff has not shown a likelihood of success on the merits. First, Plaintiff has not shown an injury sufficient for Article III standing, *see* pp. 5-22, *supra*, or even alleged facts sufficient to establish the elements of her claims, *see* ZoomInfo Br. 59-61.

Second, and more fundamentally, California law does not allow Plaintiff to recover for ZoomInfo's provision of public information that is in the public interest. The statute on which Plaintiff based her claim specifically provides that the "use of a name, voice, signature, photograph, or likeness in connection with any news, *public affairs*, or

sports broadcast or account, or any political campaign, shall not constitute a use for which consent is required" under the statute. Cal. Civ. Code § 3344(d) (emphasis added); *see Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 416 (2001) (noting that courts have interpreted "public affairs" to encompass the "public interest"). In other words, California's statutory and common-law right of publicity claims "specifically exemp[t] from liability the use of a name or likeness in connection with the reporting of a matter in the public interest." *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 793 (1995). The purpose of this exception is to "avoid First Amendment questions in the area of misappropriation by providing extra breathing space for the use of a person's name in connection with matters of public interest." *New Kids on The Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 310 n.10 (9th Cir. 1992). Because ZoomInfo's speech concerns a matter of public interest, Plaintiff cannot succeed on her claims.

Accordingly, Plaintiff has not shown a reasonable likelihood of success on the merits of her claims, and they should be dismissed under the anti-SLAPP statute.

## CONCLUSION

This Court should reverse the district court's order and remand with instructions to dismiss this lawsuit.

Dated: August 26, 2022

Respectfully submitted,

/s/ *Nicole A. Saharsky*

John Nadolenco
Jennifer M. Chang
Daniel D. Queen
MAYER BROWN LLP
350 S. Grand Avenue,
  25th Floor
Los Angeles, CA 90071
(213) 229-9500

Nicole A. Saharsky
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
nsaharsky@mayerbrown.com

Benjamin D. Bright
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500

# CERTIFICATE OF COMPLIANCE

1. **9th Cir. Case Number(s)** _____ No. 22-35305 _____

I am the attorney or self-represented party.

**This brief contains** ____ 6405 ____ **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** ___ */s/ Nicole A. Saharsky* _____ **Date** __ August 26, 2022 __

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 26, 2022. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Nicole A. Saharsky*
Nicole A. Saharsky
*Counsel for* Amici Curiae